UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 4:10-cr-309 |
| Plaintiff, | : | |
| | : | JUDGE KATHLEEN M. O'MALLEY |
| v. | : | |
| DAMIEN T. RUSS, | : | **MEMORANDUM & ORDER** |
| Defendant. | : | |

On July 27, 2010, Defendant Damien T. Russ ("Defendant" or "Russ") was charged in a one-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Before the Court is Defendant's Motion to Suppress (Doc. 24), in which he asks this Court to suppress "all evidence obtained during and after the seizure of the Defendant and during the search by law enforcement officers." Specifically, Russ seeks to suppress the firearm at issue, which, according to the government, Russ discarded while fleeing from police officers. The government filed a response to the Motion (Doc. 25), and the Court conducted a suppression hearing on December 16, 2010. Given the vague and cryptic nature of the parties' initial briefing, the Court ordered a transcript of the suppression hearing, and instructed the parties to file simultaneous supplemental briefs within ten days from receipt of the transcript. The final transcript of the suppression hearing was filed on December 28, 2010, and both parties filed their supplemental briefs on January 10, 2011 (Docs. 30 and 31.) Russ's Motion, having been fully heard and briefed, is now ripe for consideration. For the reasons articulated below, Russ's Motion to Suppress is **DENIED**.

**I.  BACKGROUND**

On July 10, 2010, Deputy U.S. Marshal William Boldin ("DUSM Boldin") and Christopher Bordonaro, a detective with the Lordstown Police Department, were working as members of the

Northern Ohio Violent Fugitive Task Force, a task force administered through the U.S. Marshals Service. Specifically, DUSM Boldin and task force officer ("TFO") Bordonaro were assigned as partners working as part of the Violence and Gun Reduction and Interdiction Program ("V-GRIP"). In that capacity, at roughly 2:30 a.m., DUSM Boldin and TFO Bordonaro (referred to collectively as "the Officers") responded to a call to assist the Warren Police Department with a large fight taking place at the Powerhouse Bar and Grill located in Warren, Ohio. DUSM Boldin testified that "there had been several shootings" and "gun-related crimes" at the Powerhouse, "mostly occurring at bar closing time." (Doc. 29, Suppression Hearing Transcript, at 39:18-24.) The Officers arrived at the Powerhouse in an unmarked, dark colored Dodge Charger. DUSM Boldin was driving the vehicle, and TFO Bordonaro was in the passenger seat. Both officers were wearing bulletproof vests marked with the name of their particular law enforcement agency.[1]

When the Officers arrived at the Powerhouse, they first pulled into the parking lot by the front entrance, which is on the south side of the building. (*Id*. at 5:20-6:9.) While there, the Officers, along with other members of the task force, dispersed the crowds that had gathered in the parking lot in conjunction with the large fight. (*Id*.) They then proceeded to the back parking lot, which is on the north side of the building. DUSM Boldin testified that he was driving at an "[e]xtremely slow" speed and that they were "just patrolling the area." (*Id*. at 102:24-103:1.)

When the Officers pulled into the back parking lot, they observed a white Cadillac parked near the employee entrance of the bar and a second vehicle parked to the left of the employee entrance staircase. (*Id*. at 23:7-18.) They also observed two individuals near the employee entrance

---

[1]DUSM Boldin was wearing a vest with the words "U.S. Marshal" on the front and back, and his badge on a chain around his neck. (Doc. 29 at 40:4-5.) Similarly, Detective Bordonaro was wearing a ballistics vest marked "police" on both sides. (*Id*. at 32:25-33:1.)

- Russ and a woman later identified as Michelle Jones, Russ's girlfriend. DUSM Boldin testified that he parked his vehicle in such a way that it was not blocking either vehicle from exiting. Indeed, Boldin explained that he "parked farther to the north end of the parking lot . . . which is why [Jones] was actually able to pull out in her car when she left, because my car was still there." (Doc. 29 at 103:20-104:3.)

The Officers observed Russ walking down the stairs from the employee entrance towards the Cadillac but noticed that, when he saw the officers pull into the lot, Russ "started to walk away from the car." (*Id*. at 28: 1-5.) DUSM Boldin recognized Russ from prior "law enforcement contacts with him," but could not recall his name or why he remembered him. (*Id*. at 40:25-41:10.) The Officers exited their vehicle and DUSM Boldin approached Russ. Boldin testified that,

> immediately as I started to walk close to him, before I could really even say or do anything, he appeared startled, he appeared nervous, basically took a fighting stance. He clenched his fist, got a very determined look on his face, and began looking to his left and his right every rapidly.

(Doc. 29 at 42:1-5.) Based on Russ's behavior, DUSM Boldin "felt that there was something wrong," and asked Russ "if everything was okay." (*Id*. at 42:16-19.) Russ responded "no," and "[a]s he was saying that he began to clench his fists" and took a "fighting stance." (*Id*. at 42:21-24.) Boldin testified that, at that point, he:

> felt that something was going to happen. I wasn't sure if he was going to run, if he was going to assault me, or what was going to happen, but I saw indicators that something bad was going to happen, something out of the ordinary. I immediately started to yell at him not to do it, whether it was going to be to run or fight, or whatever he was going to do. I said, "Don't do it."

(*Id*. at 42:25-43:6.) As he was telling Russ "don't do it," DUSM Boldin recalls that Russ "was raising his hand towards me, kind of swung his left arm towards me, and began to run." (*Id*. at 43:8-9.) DUSM Boldin testified that, as Russ "began to charge and swing" at him, Boldin grabbed at

3

Russ, but his grabbing "was in response to [Russ's] aggressive action." (*Id*. at 104:4-9.)[2] Russ made "a pushing kind of contact" with Boldin, causing Boldin to lose his balance momentarily on the gravel parking lot. (*Id*. at 43:12-18.) As he was regaining his balance and turning to chase Russ, DUSM Boldin noticed a "shiny object in his right waistband area" which he "instantly recognized [] as a firearm." (*Id*. at 43:17-21.)

DUSM Boldin yelled to TFO Bordonaro that Russ had a gun, and used his radio to notify other officers in the area that they were chasing an individual who had a firearm. Both of the Officers pursued Russ on foot, and TFO Bordonaro deployed his taser, which struck Russ in the back but was ineffective in stopping him. (*Id*. at 10:17-11:15.) The Officers testified that they lost sight of Russ temporarily, but ultimately located him hiding behind trees and bushes near the front porch of a house. (*Id*. at 47:3-19.)

Although the Officers ordered Russ to come out from his hiding place, Russ failed to comply and had to be physically removed. He was then arrested, but did not have the firearm on his person at the time of arrest. (Doc. 29 at 49:10-19.) Accordingly, a canine unit responded to the scene to search for the weapon. The dog searched along the path Russ had traveled, and alerted the Officers to a specific area to search. (*Id*. at 49:10-50:2.) DUSM Boldin observed the weapon laying on the ground in the identified area, and waited for officers from the Warren police department to photograph the gun and take it into evidence. (*Id*. at 50:21-51:2.) TFO Bordonaro testified that, although the ground conditions in the area were wet, he observed that the firearm appeared to be dry. (*Id*. at 17:10-17; *see id.* at 34:1-8; *see also id.* at 63:1-8 (DUSM Boldin similarly testified that the

---

[2]The Officers testified that the initial interaction between DUSM Boldin and Russ "happened in a matter of mere seconds, if not less than that." (Doc. 29 at 42:9-13.) Indeed, DUSM Boldin explained that Russ's "physical swinging of his arm toward me happened simultaneously with him starting to run." (*Id*. at 105:22-24.)

4

gun was dry).) Neither Boldin nor Bordonaro handled the firearm. TFO Bordonaro testified that he did not know whether the weapon was tested for fingerprints or if any ballistics were run. (*Id*. at 34:9-11.)

At the suppression hearing, Russ offered the testimony of his girlfriend, Michelle Jones, who paints a different picture of the events that took place on July 10, 2010. Jones testified that they were at the Powerhouse that night because Russ worked there as a freelance photographer. At the time of the encounter, Russ had been taking photographs of patrons at the Powerhouse for approximately six (6) months. (Doc. 29 at 69:17-70:7.) Around 3:00 a.m., she and Russ were getting ready to leave the Powerhouse, and exited through the employee entrance on the north side of the building where they had parked their cars. According to Jones, she had parked her 2006 Pontiac Solstice roughly two (2) feet behind Russ's Cadillac.

Jones testified that, as she and Russ were walking to their cars, a "black Charger just swarmed into the parking lot." (*Id*. at 75:13-16.) According to Jones, the Charger stopped facing the Cadillac at a diagonal in such a way that prevented Russ from getting into his car and blocked both of them from exiting the parking lot. (*Id*. at 77:21-78:7.) Jones testified that DUSM Boldin "jumped out the car and went up to Damien and grabbed his shoulder." In response, Russ swung his arm around in an effort to "maneuver the police officer's hand from his shoulder." (*Id*. at 78:8-25.) The next thing Jones recalls is Russ tossing his camera to her before he took off running. Jones testified that she was scared during the encounter and did not know if she had a right to leave during the interaction with the Officers. (*Id*. at 80:13-21.) Once the Officers started to chase Russ, Jones got in her car and left, though she asserts she needed to drive over a curb to do so. (*Id*. at 80:5-8.)

Jones testified that she had spent roughly six (6) hours at the Powerhouse with Russ and

5

never saw a gun on him. She explained that, if Russ had a gun on his person she would have noticed it while they were slow dancing or when Russ was taking pictures, because "every time he would lift his camera his underwear would show" and the only thing on his belt was a key chain that had on it two sets of car keys, a can opener, and an R2D2 figurine. (*Id*. at 81:15-82:16.)

## II. DISCUSSION

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). In the absence of physical force, "even if there is a show of authority and a reasonable person would not feel free to leave, in order for a seizure to occur there must also be submission to the show of authority." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (citations omitted).

Not every interaction between an officer and a citizen is a seizure within the meaning of the Fourth Amendment, however. *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). There are three types of permissible encounters between police officers and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *Smith*, 594 F.3d at 535 (quoting *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000)).

Investigative detentions and arrests are considered seizures "and thus must be conducted consistent with []Fourth Amendment principles." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). A consensual encounter, however, is not a seizure and, therefore, the Fourth Amendment is not implicated, "as long as [an] officer's actions do not convert it into an investigative detention."

6

*Id*.

Resolution of Russ's Motion to Suppress turns on whether the initial interaction between Russ and the officers was a consensual encounter or an investigatory detention as defined in *Terry v. Ohio*, 392 U.S. 1 (1968).[3]  According to Russ, the Officers' conduct amounted to "an illegal *Terry* Stop, not a consensual encounter." (Doc. 31 at 1.)  Specifically, Russ argues that, prior to his flight from the Officers, the police had stopped and seized him without reasonable suspicion in violation of *Terry*.  Russ argues that, because the Officers lacked reasonable suspicion to justify a *Terry* stop, their conduct in seizing him violated the Fourth Amendment, and, therefore, the firearm should be suppressed.  Russ also briefly argues that there was insufficient evidence connecting him to the firearm at issue.

In contrast, the government argues that the initial contact between the Officers and Russ was consensual, and that "Russ was not detained or seized when he was approached by Deputy Boldin." (Doc. 30 at 2.)  The government further argues that Russ's behavior during the initial encounter "gave [the Officers] reasonable suspicion that some illegal activity may be afoot," and his subsequent actions "gave them reasonable cause to arrest him for assaulting a police officer." (*Id*. at 4-5.)

For the reasons articulated below, the Court finds that: (1) the initial encounter between Russ

---

[3]Notably, in his supplemental briefing, Russ does not argue that he was arrested without probable cause.  At the suppression hearing, moreover, defense counsel argued that the initial encounter was a seizure, and did not focus on the constitutional propriety of the arrest.  The Officers testified that Russ was arrested only after he pushed DUSM Boldin, fled from the Officers, and Boldin saw a shiny object at Russ's waistband.  As such, the Court focuses its inquiry on whether the initial encounter was consensual or amounted to an investigatory detention. *See United States v. Spencer*, No. 1:10-CR-108, 2011 U.S. Dist. LEXIS 9886, *8-9 n.2 (S.D. Ohio Feb. 2, 2011) (noting that defendant did not "present any evidence that would support a finding that he was arrested without probable cause" and therefore focusing the inquiry "only to the *Terry* issue raised at the hearing").  At the same time, the government does not contend that the Officers had any basis to detain Russ when they first approached him.

and the Officers was consensual, and thus no suspicion was required; and (2) Russ's actions, including his conduct in pushing DUSM Boldin and then running away, coupled with the fact that Boldin observed a firearm on Russ while he was fleeing, gave the Officers reasonable suspicion to detain him. Accordingly, the Court will not suppress the firearm at issue in this case. The Court will, however, give the government ten days from the date of this Order to file a supplemental brief addressing Russ's evidentiary challenge, to reference to the firearm at trial.

### A. The Difference Between Consensual Encounters and Investigatory Detentions

Police officers can initiate a consensual encounter with a citizen without regard to suspicion of criminal activity. It is well-established that an officer may approach a citizen and "generally ask questions of that individual, ask to examine that individual's identification, and request consent to search . . . as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991). As long as a "reasonable person would feel free to disregard the police and go about his business," the encounter is consensual and no suspicion is required. *Id.* at 434 (quoting *California v. Hodari D*, 499 U.S. 621, 628 (1991)); *see also Waldon*, 206 F.3d at 603 (finding that "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that [they were] not free to leave"). "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity." *Waldon*, 206 F.3d at 603 ("We know of no legal precedent suggesting a police officer can engage in a consensual encounter only with citizens whom he does not suspect of

8

wrongdoing.").

With respect to investigatory detentions, or *Terry* stops, an officer can stop and briefly detain a person when the officer "has reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity." *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007) (citation omitted) (emphasis in original). "Reasonable suspicion" exists when, "based on the totality of the circumstances, a police officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Gross*, 624 F.3d 309, 315 (6th Cir. 2010) (quoting *United States v. Baldwin*, 114 Fed. Appx. 675, 679 (6th Cir. 2004)). In assessing the totality of the circumstances, police officers may "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (internal citations omitted). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Baldwin*, 114 Fed. Appx. at 679 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Sokolow*, 490 U.S. at 7).[4]

An encounter that begins "as an attempt by the police to consensually obtain" information can "develop[] into circumstances in which an investigative detention [is] justified." *United States v. Kimber*, 33 Fed. Appx. 717, 721 (6th Cir. 2002). A consensual encounter "becomes a seizure

---

[4]Probable cause "exists where the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007) (quoting *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1508 (6th Cir. 1988) (internal quotation marks omitted).

when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In *Mendenhall*, the Supreme Court set forth several factors which, if present, are indicative of a seizure. Those factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554.

With this framework in mind, the Court turns to whether initial interaction between the Officers and Russ was a consensual encounter or a *Terry* stop.

### B. The Initial Encounter was a Consensual Encounter, Not a Seizure, and Thus No Suspicion Was Required.

Russ argues that his encounter with the Officers "was a seizure because [he] was not free to leave." (Doc. 31 at 3.) Specifically, Russ argues that: (1) there was a "threatening presence of several officers;" (2) the Officers parked their vehicle so that Russ was unable to terminate the encounter; (3) Boldin made physical contact with him when he grabbed his shoulder; and (4) by telling him "don't do it," Boldin used language indicating that compliance with the Officers' might be compelled. If Russ's description of the events on July 10, 2010 were correct, his characterization of those events as an unwarranted seizure would also be correct, and suppression of the evidence arising from that seizure would be warranted. The problem with Russ's analysis, however, is that he groups together a series of actions and labels them as "the encounter" when, in fact, as discussed below, the encounter began with an initial communication and escalated, based on Russ's conduct, into a situation where the Officers had reasonable suspicion to detain him.

10

First, the record is clear that only DUSM Boldin and TFO Bordonaro were involved in the encounter with Russ. It is undisputed that none of the other officers who had responded to the fight at the Powerhouse were in the back parking lot during the initial encounter.[5] The record is clear that only Boldin approached Russ, while Bordonaro remained near their vehicle. There is also no evidence that the Officers displayed their firearms. And, although Jones testified that the Officers were wearing all black and, thus, were not identifiable as law enforcement, the Officers testified that, as members of the V-GRIP, they were wearing ballistics vests labeled with large lettering identifying their respective law enforcement agencies on the front and back, and the Court finds their testimony credible. Accordingly, the Court finds that the encounter did not involve the "threatening presence of several officers."

Russ next argues that he "was not free to leave because of the location of the encounter." (Doc. 31 at 4.) Specifically, Russ claims that the Officers parked their vehicle in such a way that prevented him from terminating the encounter. In response, the government submits that the Officers: (1) parked their vehicle in an area which did not block Russ's Cadillac; and (2) "did not know that the Cadillac was Russ' car when they entered the parking lot." (Doc. 30 at 2-3.)

The Sixth Circuit has held that blocking an individual's car "to determine the identity of the occupants and maintain the status quo while obtaining this information [is] a warrantless *Terry* seizure." *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009); *see also Gross*, 624 F.3d at 315 ("Gross is correct that when Officer Williams blocked the car in, he began an investigatory *Terry* stop."). In *See*, the parties agreed that "a *Terry* stop began when [the officer] parked his patrol car in front of [the defendants's] car because "a reasonable person in [the defendant's] position would

---

[5]The Officers testified that they did not call for back-up until DUSM Boldin saw that Russ had a firearm.

11

not have felt free to leave." *Id*. at 313. Although the court noted that the officer "could, of course, have pursued a consensual encounter with the occupants of the car," at the time he parked his patrol car in front of the defendant's vehicle, he "did not suspect the men of a specific crime, he had not seen the men sitting in the car for an extended period of time, he was not acting on a tip, he had not seen the men do anything suspicious, and the men did not try to flee upon seeing [the officer] approach." *Id*. at 314. As such, the court in *See* concluded that the *Terry* stop was not supported by reasonable suspicion and was therefore improper.

The Court finds that the facts at issue in *See* are readily distinguishable from the facts presented here. It is undisputed that Russ's Cadillac was parked near the Powerhouse's employee entrance and that Jones's vehicle was parked behind it. Although Jones testified that the Officers parked their vehicle at a diagonal to prevent Russ from leaving, TFO Bordonaro testified that they parked "several feet" to the side of Russ's vehicle and were parallel to it. (Doc. 29 at 24:12-13.) The Court finds the Officers' testimony credible, particularly in light of Jones's testimony that she was able to drive her vehicle from the parking lot while the Officers' vehicle was still there. In other words, Russ could have removed his Cadillac from the lot the same way Jones removed her vehicle. Accordingly, the Court finds that the placement of the Officers' vehicle in relation to Russ's car did not transform the Officers' initial consensual encounter into a *Terry* stop.

With respect to the physical contact between Russ and DUSM Boldin, Russ mischaracterizes the credible evidence adduced at the suppression hearing. Russ argues that Boldin jumped out of his vehicle, went up to him, and grabbed his shoulder. (Doc. 31 at 3-4.) Russ further argues that he merely took "a defensive position and attempt[ed] to remove himself from Boldin's grasp." (*Id*. at 4.) As such, Russ contends, his own conduct toward Boldin was not an assault, and he was simply

12

attempting to "keep Boldin out of his personal space." (Doc. 31 at 4.)

In contrast, DUSM Boldin testified that Russ was agitated and nervous when they approached him. Based on Russ's behavior, Boldin "felt that there was something wrong" and asked Russ "if everything was okay." (Doc. 29 at 42:16-19.) Nothing about Boldin's question to Russ suggested that Russ's freedom to walk away was in any way conditioned upon answering. Nor is there any evidence that Boldin's tone was confrontational. Russ responded "no," and "[a]s he was saying that he began to clench his fists" and took a "fighting stance." (*Id*. at 42:21-24.) Boldin testified that, at that point, he:

> felt that something was going to happen. I wasn't sure if he was going to run, if he was going to assault me, or what was going to happen, but I saw indicators that something bad was going to happen, something out of the ordinary. I immediately started to yell at him not to do it, whether it was going to be to run or fight, or whatever he was going to do. I said, "Don't do it."

(*Id*. at 42:25-43:6.) As he was telling Russ "don't do it," DUSM Boldin recalls that Russ "was raising his hand towards me, kind of swung his left arm towards me, and began to run." (*Id*. at 43:8-9.) DUSM Boldin testified that:

> There was physical contact. He swung his left arm up and out towards me. I raised my arm to try to grab his arm or to block him, so he would have struck my arm, which knocked me somewhat off balance in the gravel parking lot, because as he was doing that he was also beginning to run, which caused me to lose my balance and fall backwards when he made contact with me.

(*Id*. at 66:3-9.) In other words, DUSM Boldin's testimony clarified that he did not initiate physical contact with Russ and that he merely grabbed at Russ "in response to his aggressive action." (*Id*. at 104:4-9.)[6] To the extent Jones's testimony characterized Boldin's approach as more aggressive, the

---

[6] Although Jones testified that DUSM Boldin initiated the contact, she similarly testified that Russ was swinging his right arm and Boldin was grabbing at Russ's shoulder. (*See* Doc. 29: 78:23-25) ("Q. Are you saying the police officer was grabbing the shoulder and Damien was swinging his right arm? A. Correct.").

13

Court finds that she was unable to recall the precise sequence of events, a sequence that is critical to the Court's analysis. Accordingly, the Court finds that the only physical contact between Russ and DUSM Boldin consisted of Russ pushing Boldin, and Boldin trying to grab at Russ to stop the contact. Even assuming *arguendo*, that Boldin's conduct in grabbing at Russ then elevated the encounter into a *Terry* stop, as discussed below, at that point in the encounter, the Officers had reasonable suspicion to detain him.

It is undisputed that, after their initial communications, DUSM Boldin told Russ "don't do it." Despite Russ's contentions to the contrary, the Court finds that, under the circumstances, this statement did not qualify as language "indicating that compliance with the officer's request might be compelled." *See Mendenhall*, 446 U.S. at 554. At that point in the encounter, DUSM Boldin had observed that Russ appeared startled, was acting nervous, had clenched his fist, and "basically took a fighting stance." (Doc. 29 at 42:1-5.) Boldin testified that, based on the circumstances, he believed that Russ might assault him, so he told Russ "don't do it." The Court finds that this statement, standing alone, did not transform the encounter into a seizure. A reasonable person could interpret Boldin's comment to mean "don't take a swing at me." Unlike a command or order, the phrase "don't do it" is not the type of language that would have elevated the encounter into a seizure. Even if the statement "don't do it" could somehow be characterized as a show of authority, Russ was not seized because he fled and thus did not submit to that authority. *See Brendlin v. California*, 551 U.S. 249, 262 (2007) ("[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered.").

DUSM Boldin testified that, when he got out of his vehicle to approach Russ, he had no intention to detain or arrest him:

14

> We were attempting to just get out and talk to him, have a voluntary encounter, the same as we had had with dozens and dozens of other people that night, including other employees of the bar that we had talked to just moments earlier in the front parking lot.

(Doc. 29 at 45:11-17.) Because police officers can approach citizens to ask questions, even without possessing any suspicion of criminal activity, the Officers' conduct in approaching Russ to ask if "everything was okay" was permissible under the Fourth Amendment.

For the foregoing reasons, the Court finds that the initial interaction between Russ and the Officers was a consensual encounter, not a seizure – at least until the point when Russ pushed Boldin and took off running, which, as discussed below, gave the officers reasonable suspicion to stop Russ. Because the initial encounter was consensual, no reasonable suspicion was required.

**C.    Russ's Conduct Gave the Officers Reasonable Suspicion Sufficient to Justify a *Terry* Stop.**

The government argues that, as soon as Russ pushed DUSM Boldin and took off running, the Officers had both "reasonable suspicion that Russ was involved in some illegal activity" and "reasonable cause to arrest him for assaulting a police officer." (Doc. 30 at 5.) Although the initial encounter between the Officers and Russ was brief,[7] the Court finds that it began as a consensual encounter and escalated into a situation where the Officers had reasonable suspicion to detain Russ. The Court need not address, accordingly, whether the swinging of Russ's arm toward Boldin was sufficient to give the Officers probable cause to believe that an assault on a police officer had occurred.

As noted, to support a *Terry* stop, a police officer need only have "a reasonable, articulable suspicion that criminal activity is afoot." *Wardlow*, 528 U.S. at 123. Courts consider a number of

---

[7]DUSM Boldin testified that the entire encounter with Russ, pre-flight, "happened in a matter of mere seconds, if not even less than that." (Doc. 29 at 42:9-13.)

15

factors in evaluating whether reasonable suspicion exists. The most common factors include: (1) nervous or evasive behavior; (2) furtive movements in response to the officer's presence; (3) presence in a high crime area; (4) the time of day; and (5) the speed of the individual's movements. *See id.* at 123-24; *see also United States v. Caruthers*, 458 F.3d 459, 466-68 (6th Cir. 2006) (noting that the "contextual considerations" such as time of day and presence in a high crime area "may not, without more, give rise to reasonable suspicion" but "they are relevant to the reasonable suspicion calculus"). While a citizen is free to walk away from police, unprovoked flight from police officers can justify a *Terry* stop. *Wardlow*, 528 U.S. at 124-25 (noting that flight is "the consummate act of evasion" and it is "certainly suggestive" of wrongdoing).

Looking to the totality of the circumstances, the Court finds that, during the course of the encounter, the Officers developed sufficient reasonable suspicion to detain Russ. The Officers testified that Russ: (1) was agitated and nervous when they approached him; (2) took a fighting stance towards DUSM Boldin; and (3) pushed Boldin and took off running.[8] Russ's physical contact with Boldin, coupled with his simultaneous flight, gave the Officers reasonable suspicion to detain him.

While Russ was running away, moreover, Boldin noticed a shiny object at his waistband. Boldin testified that, based on his law enforcement experience, he instantly recognized the object as a firearm. At that point, he had reasonable suspicion to detain Russ to investigate further. The fact that Russ pushed Boldin and then took off running, taken together, could reasonably suggest that

---

[8] In addition, the encounter took place around 3:00 a.m. in a high-crime area. Indeed, the Officers were called to the Powerhouse that night to disperse a fight. These factors, while relevant to the totality of the circumstances inquiry, are not sufficient, standing alone, to support a finding of reasonable suspicion. *See Caruthers*, 458 F.3d at 467. The Court does, however, keep these contextual factors in mind when conducting its analysis.

16

he fled so he could dispose of the weapon or other contraband. *See Caruthers*, 458 F.3d at 467 (finding that the defendant's "flight from the police immediately preceding his unusual posture . . . could reasonably suggest that [he] fled . . . so that he could discard a weapon or other contraband"). Once Boldin saw the concealed weapon, the Officers were entitled to act for their own protection, and for the protection of others in the area, and attempted to do so by deploying a taser. *See United States v. Townsend*, 206 Fed. Appx. 444, 448 (6th Cir. 2006) ("[T]he observed presence of a handgun within [the defendant's] reach clearly enhanced the suspiciousness of the circumstances and called for swift and sure action."). Looking to the totality of the circumstances, and giving due deference to the Officers' factual inferences, the Court finds that the Officers had, at a minimum, reasonable suspicion to justify a *Terry* stop.

Russ relies heavily on the Sixth Circuit's decision in *Baldwin* for the proposition that his "flight cannot validate the officers' unconstitutional seizure." (Doc. 31 at 5.) The facts in *Baldwin*, however, are readily distinguishable from the facts in this case. In *Baldwin*, police officers were investigating a shooting in a high-crime area. *Baldwin*, 114 Fed. Appx. at 676. The officers came across a parked car with two individuals sitting in the front seats. *Id*. When the officers questioned the occupants about the shooting, they denied having any knowledge about it. At some point, the defendant was instructed to exit the vehicle. As he was doing so, an officer "spun him around, and conducted a pat down search." *Id*. at 677. During the pat down, the defendant broke free and took off running. When the officer tackled him, he found a firearm in the defendant's pocket. *Id*.

The court in *Baldwin* found that the initial encounter between the police officers and the defendant was not consensual because, among other things, the officers: (1) parked their police cruisers in such a way that surrounded the defendant's vehicle and prevented him from leaving; and

17

(2) "made explicit demands . . . which clearly conveyed a message that their compliance was required." *Id.* at 678-79. The court next concluded that the officers lacked reasonable suspicion to stop and detain the defendant. *Id*. at 681. On appeal, the government argued that the defendant's "subsequent flight provided independent grounds for an arrest." *Id*. at 682. The court rejected this argument on grounds that the officer had discovered the gun during the initial pat down and, therefore, "the subsequent detention following Baldwin's resistance failed to reveal any evidence that was not *already known*" to the officer. *Id*. (emphasis in original).

Unlike the situation in *Baldwin*, where the officers seized the defendant as soon as they surrounded the defendant's vehicle and began questioning him about a crime, here, what began with DUSM Boldin asking Russ if "everything was okay" developed into circumstances in which a seizure was justified. To the extent a *Terry* stop occurred, it began only after Russ pushed Boldin and took off running. Indeed, Boldin testified it was not until Russ took a swing at him that Russ was no longer free to leave.[9] And, significantly, unlike the scenario in *Baldwin*, where the defendant was seized during the pat down and then fled, at the time Russ ran from the Officers, there had been no seizure. As noted, moreover, it was not until after Russ took off that Boldin noticed the concealed firearm at Russ's waistband and then attempted to detain him.

As previously discussed, the Court finds that, by the time Russ was seized, the Officers had, at a minimum, reasonable suspicion of criminal activity. Accordingly, there is no evidence that Russ's Fourth Amendment rights were violated.

### D. The Court Will Reserve Ruling on Russ's Evidentiary Challenge.

In his supplemental briefing, Russ, for the first time raises an evidentiary challenge, arguing

---

[9]Boldin further testified that, when Russ took off running and he saw the weapon at Russ's waistband, he had probable cause to arrest Russ. (Doc. 29 at 65:15-22.)

that "the actual recovery of the weapon post flight and second seizure does not solidly place the gun in [his] hands." (Doc. 31 at 6.)  Specifically, Russ argues that the firearm was not found "immediately next to him" and it was never tested for fingerprints.  Because the incident took place in a high crime area known for gun violence, Russ argues, "the police cannot conclusively state that the gun found in the bushes post flight belonged to" him. (*Id*. at 6-7.)  Based on these arguments, Russ asks the Court to order *in limine* that the gun, and the fact of its discovery, be excluded from the trial of this matter on evidentiary, rather than constitutional grounds.

Russ's evidentiary challenge was not raised in his initial Motion to Suppress.  At the suppression hearing, moreover, defense counsel claimed that Russ was not asserting an evidentiary challenge.[10]  As a result, the government's supplemental briefing does not specifically address Russ's evidentiary challenge.  Accordingly, the Court will reserve ruling on Russ's evidentiary challenge, and will give the government an opportunity to respond to it in writing.  The government shall have ten (10) days from the date of this Order to file a response if it chooses to do so.  At that

---

[10]At the suppression hearing, the Court asked defense counsel whether Russ was seeking to exclude the firearm on evidentiary grounds:

The Court:  [B]ecause it's unclear from the testimony you've presented and from [] some of the things you just said, are you separately seeking to exclude the gun on evidentiary grounds?

Mr. Gardner:  Evidentiary grounds?  Well, let me explain that.  No.  What I'm saying is that the evidence that he had a gun on his person is a police officer seeing somebody fleeing, and the person that's fleeing is about 15 feet from him, kind of a tenuous identification of the gun on his person.  That's the point, that's the only point I was trying to make.

(Doc. 29:111:5-15.)

19

point, the Court will consider the matter ripe for resolution.

### III. CONCLUSION

For the foregoing reasons, Russ's Motion to Suppress (Doc. 24) is **DENIED**. The government shall have **ten (10) days** from the date of this Order to file a supplemental brief addressing Russ's evidentiary challenge. The Court will conduct a pretrial in this matter on **March 9, 2011** at **11:00 a.m.** to address Defendant's motion in limine and to set a trial date in this case.

**IT IS SO ORDERED.**

                                              **s/Kathleen M. O'Malley**
                                              **KATHLEEN McDONALD O'MALLEY***

**Dated: February 18, 2011**

---

\* *United States Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.*